Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

| Name of Assigned Judge or Magistrate Judge | Joan B. Gottschall | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 95 C 2389 | **DATE** | 12/9/2002 |
| **CASE TITLE** | Evelyn L. Houston vs. Provident Life & Accident Insurance | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]

(2) ☐ Brief in support of motion due _____.

(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.

(4) ☐ Ruling/Hearing on _____ set for _____ at _____.

(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.

(7) ☐ Trial[set for/re-set for] on _____ at _____.

(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.

(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
☐ FRCP4(m)  ☐ Local Rule 41.1  ☐ FRCP41(a)(1)  ☐ FRCP41(a)(2).

(10) ■ [Other docket entry] Enter Memorandum Opinion and Order. After a trial based on the evidence in the administrative record, the court finds that Provident's decision to terminate Houston's disability benefits was arbitrary and capricious. Accordingly, the court remands this case to the plan administrator, Provident, with the following instructions: (1) Provident shall acknowledge that Houston was disabled as of December 31, 1994 (the date it terminated her benefits), (2) should Provident seek to establish that Houston's disability ended at some point, Provident shall permit additional evidence into the record to determine the duration of Houston's disability since December 31, 1994 (including but not limited to the MRI report dated August 26, 1996), and (3) Provident shall be liable to Houston for benefits for all additional time after December 31, 1994 during which Houston was disabled. Once the extent of Houston's damages for lost benefits have been determined, the parties may return to this court to brief the issue of attorney's fees, costs, and prejudgment interest.

(11) ■ [For further detail see order attached to the original minute order.]

| | No notices required, advised in open court. | | | | **Document Number** |
|---|---|---|---|---|---|
| | No notices required. | | | number of notices | |
| | Notices mailed by judge's staff. | | | | |
| | Notified counsel by telephone. | | DEC 1 1 2002 | | |
| ✓ | Docketing to mail notices. | | date docketed | | |
| ✓ | Mail AO 450 form. | U.S. DISTRICT COURT | docketing deputy initials | 123 |
| | Copy to judge/magistrate judge. | | | | |
| | courtroom deputy's initials | 2002 DEC 10 PM 3: 22 | DEC 1 1 2002 | | |
| | | FILED-ED IO | date mailed notice | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | | |

**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF ILLINOIS**
**EASTERN DIVISION**

| | | |
|---|---|---|
| EVELYN L. HOUSTON, | ) | |
| Plaintiff, | ) | |
| v. | ) | No. 95 C 2389 |
| | ) | |
| PROVIDENT LIFE AND ACCIDENT | ) | |
| INSURANCE COMPANY, | ) | Judge Joan B. Gottschall |
| | ) | |
| Defendant. | ) | |

DOCKETED

## MEMORANDUM OPINION AND ORDER

DEC 1 1 2002

Plaintiff Evelyn Houston has filed suit against defendant Provident Life and Accident

Insurance Company ("Provident"), challenging the termination of her benefits under the

Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001-1461. Specifically,

Houston brings her claim under § 1132,[1] which allows her, as a participant or beneficiary of an

ERISA plan, to bring a civil action "to recover benefits due to [her] under the terms of [her] plan,

to enforce [her] rights under the terms of the plan, or to clarify [her] rights to future benefits

under the terms of the plan." 29 U.S.C. § 1132(a)(1)(B). As this court previously ordered, the

trial evidence in this case is limited to the administrative record. *Houston v. Provident Life &*

*Accident Ins. Co.*, No. 95 C 2389, 2002 WL 989468, at *4 (N.D. Ill. Feb. 21, 2002.)

Accordingly, the court's task is to review the administrative record and determine whether

---

[1]Both parties have proceeded throughout this litigation as though Houston's claim arises
under § 1132, even though the amended complaint alleges only violations of §§ 1133, 1140,
1141, and 1144. Accordingly, the court previously deemed the "complaint as constructively
amended by the parties to add a claim under § 1132." *Houston v. Provident Life & Accident Ins.
Co.*, No. 95 C 2389, 2002 WL 989468, at *1 (N.D. Ill. Feb. 21, 2002) (citations and internal
quotation marks omitted).

Provident's decision to terminate Houston's disability benefits was "arbitrary and capricious."[2] As explained below, the court finds that Provident's decision to terminate Houston's disability benefits was arbitrary and capricious.

## I. Background

### A. Facts

Houston worked as a legal secretary for the law firm of Sidley & Austin in Chicago from April 30, 1990 through June 14, 1993. In December 1992, she injured several cervical discs while lifting boxes at work. As a result of that injury, Houston stopped working at the law firm on June 14, 1993.

Houston sought medical treatment for her spinal injury, which included, among other things, regular visits to a family practice physician and a neurosurgeon, and more than one hospitalization. She also underwent an evaluation by Dr. James W. Ryan, a consultant in orthopedic surgery, on July 20, 1993.[3] In his report, Dr. Ryan concluded that Houston could "return to the work she was doing without limitations." But Dr. Ryan also noted that "patient's physician wants to order an MRI," and that as of the date of the examination, Houston had "not

---

[2]As noted in this court's earlier decision, the applicable standard of review depends upon whether the benefit plan at issue grants discretion to the plan administrator. *Houston*, 2002 WL 989468, at *1 (*de novo* review if administrator has no discretion; arbitrary and capricious standard if administrator does have discretion). Here, both parties agree that the plan grants discretion to Provident, and that the "arbitrary and capricious" standard of review therefore applies. *Id.*

[3]Dr. Ryan's examination was the Independent Medical Examination required as part of Houston's workman's compensation claim, which was subsequently denied.

had any special testing, surgery or hospitalization for this injury."[4]  On August 2, 1993, after Dr. Ryan's examination, Houston had an MRI taken of her spine (the "1993 MRI") which showed injuries to two cervical discs.

On December 28, 1993, Houston submitted an initial claim for long term disability benefits under Sidley & Austin's long term disability insurance policy issued by Provident (the "Policy").  Under the policy, an employee is disabled from her *own* occupation if she is unable to earn at least 80% of her indexed earnings, or unable to perform each of the material duties of the occupation that she regularly performed for her employer.  (Admin. R. at 227, 232.)[5]  Similarly, an employee is disabled from *any* occupation if she is unable to earn at least 80% of her indexed earnings from any occupation for which she is "reasonably fitted by education, training or experience," or if she is unable to perform each of the material duties of any such occupation. (*Id.*)

In addition to Houston's initial claimant's statement, Provident received both her executed authorization permitting the release of Houston's medical-record information to Provident and an attending physician's statement of disability dated December 28, 1993 from Houston's family practice physician, Dr. Mahendra Patel.  Provident subsequently asked Dr. Patel for medical records and additional medical information regarding Houston.  In March 1994, Provident received Dr. Patel's medical records relating to Houston, including a two-page clinical

_____

[4]Dr. Ryan was incorrect regarding hospitalization: Houston was first hospitalized for her spinal injury in January 1993.

[5]The administrative record is Bates stamped, with the prefix PLACL preceding the Bates number on each page.  All citations to the administrative record in this opinion use the Bates number.

summary report by Dr. Patel. The clinical summary stated that (1) Houston had received physical therapy, cervical traction and ultrasound therapy, but had no relief from the pain, (2) Dr. Alan Kaufman, Houston's neurosurgeon, advised that she required surgery in order to relieve the symptoms and pain, and (3) Houston was waiting for approval from her insurance company to undergo surgery. This report also included a summary of the results of the 1993 MRI. Specifically, Dr. Patel's clinical summary stated that:

> The patient was [sic] center and right of the central disc herniation of the sixth cervical disc with secondary compromise of the anterolateral subarachnoid space. The patient also had central bulging annulus of the fifth cervical disc.

(Admin. R. at 76-77.) Dr. Patel concluded that, in his medical opinion,

> this patient needs further work up, like a myelogram[,]and if the myelogram is consistent with the MRI of the cervical spine, then the patient will definitely need removal of the cervical disc which was causing the compression of the nerves and the patient should have a laminectomy and removal of the disc.

(*Id.* at 77.)

After evaluating Houston's claim file, Provident, through disability claim specialist Jan Larson, notified Houston in a letter dated March 30, 1994 that her claim for long term disability benefits was approved. In June 1994, Sidley & Austin forwarded Larson a copy of Dr. Ryan's report issued the previous year. After reviewing Dr. Ryan's report, Larson asked Provident's medical advisor, Dr. Fred O'Connell, to review Houston's file again and advise whether an Independent Medical Examination (IME) was necessary. Dr. O'Connell recommended that an IME should be performed. Through an outside service, Larson thus arranged for Houston to undergo an IME performed by Dr. Churl-Soo Suk, an orthopedist. Dr. Suk examined Houston on September 1, 1994 and issued a report dated September 16, 1994 regarding that examination.

4

Dr. Suk concluded that:

> I believe the patient has been having some problems of the neck condition for some time which was diagnosed as herniated nucleus pulposus between C5 and C6 by MRI examination and the patient is under the care of a neurosurgeon at this time. I think further evaluation and care by the neurosurgeon for the cervical spine is needed.

(Admin. R. at 99.)

On the same day that Dr. Suk issued his report, Provident received notice that the Social Security Administration had found Houston eligible to receive monthly disability benefits.[6]

Provident subsequently asked Dr. Suk to provide additional information, so Dr. Suk supplemented his original narrative report with a completed physical capacities form and a letter answering certain questions.[7] The questions and answers were:

> 1. Define this claimant's current diagnosis, recommend treatment program and prognosis.
>     Answer: Diagnosis: Suspected herniated nucleus pulposus between C5 & 6 and mild degenerative changes between C5 & 6.
>
> 2. In your opinion, may this person return to his/her regular occupation at this time? If currently disabled from his/her occupation, please indicate when he/she might be able to return to that type of work.
>     Answer: No. The patient should be further evaluated by a neurosurgeon.

---

[6]Houston filed her application for social security disability benefits in January 1994, a few weeks after filing her initial claim with Provident.

[7]The date on this letter apparently is incorrect; although the letter is dated September 16, 1994, Dr. Suk states that he is responding to a letter dated September 26, 1994. Further, the physical capacities form executed by Dr. Suk, which evidently was submitted at the same time as the letter, is dated October 6, 1994. The administrative record indicates that on October 17, 1994, Provident received the letter, the physical capacities form, and a transmittal memo from the outside service dated October 13, 1994.

3. May this person return to some other type of work at this time? If currently unable to return to any type of work, please indicate when he/she might be able to do so and describe the objective findings that support total disability.
      Answer: No.

4. Complete the attached physical capacities form.

(Admin. R. at 96-97.) In his letter, Dr. Suk unequivocally stated that Houston could not return to work and required further evaluation by a neurosurgeon. On the physical capacities form, however, Dr. Suk (1) placed no restrictions on Houston's ability to stand, walk, sit or drive during an eight-hour workday, (2) indicated that Houston should not push or pull with her hands, (3) indicated that Houston could bend, squat, kneel, balance, and be exposed to heat or cold only occasionally, and (4) indicated that Houston could lift or carry no more than ten pounds, and could do so only occasionally. Regarding when Houston would be able to return to work, Dr. Suk did not respond with a date, but rather designated light duty (as opposed to full duty) "pending neurological evaluation." (Admin. R. at 91.)

Provident found Dr. Suk's opinion that Houston could not work to be inconsistent with the physical capacities form. As a result, on October 20, 1994, Larry Dunn, a senior rehabilitation consultant for Provident, sent a letter to Dr. Suk asking for clarification of his opinion. Dunn wrote: "Although you stated in your report that Ms. Houston is unable to work and should continue under the evaluation and treatment of her neurosurgeon, your Physical Capacities form indicates she has a wide range of work capacity and should be able to perform numerous jobs full time." (Admin. R. at 17.) Dunn then listed as examples ten different jobs he was "confident" Houston could perform, and asked "Do you agree or disagree that Ms. Houston is capable of such employment?" Id. The administrative record contains no response from Dr.

6

. Suk to the request for clarification.[8]

Also on October 20, 1994, Larson wrote to Houston's neurosurgeon, Dr. Kaufman, to request Houston's medical records, enclosing a copy of Houston's authorization to release her medical-record information.[9] The administrative record contains no response from Dr. Kaufman.

On December 6, 1994, Larson sent Houston a letter requesting that she and her physician complete a claim form within thirty days to update Houston's proof of disability. Two weeks later, on December 21, 1994, Dunn contacted Ellis & Associates, an agency specializing in vocational rehabilitation counseling, asking them to contact Houston to set up a home visit regarding rehabilitation counseling and a transferability skills analysis. Dunn also contacted Houston that day and informed her to expect a call from Ellis & Associates. The following week, on December 28, 1994, Dunn spoke with two members of Sidley & Austin's employee benefits team, who raised concerns regarding the validity of Houston's claim. Dunn also spoke with Gary Wilhelm from Ellis & Associates, who advised Dunn that although he had made contact with Houston, she had not yet agreed to schedule a date for Wilhelm to interview her. Later that same day, in a recommendation to Larson, Dunn wrote that

> further review of the file indicates that [Houston] has very little objective info to substantiate disability. A neurosurgeon named Kaufman is alleged to advise

---

[8]According to Dunn's notes, he contacted Dr. Suk's office on November 16, 1994 to follow up on his October 20th letter; Dr. Suk's secretary informed him that she could not find the October 20th letter, so Dunn faxed her a copy. When Dunn called again on November 30, 1994, the secretary told him that Dr. Suk had not had an opportunity to address Dunn's letter. The administrative record contains no further references, other than Dunn's notes of December 28, 1994 in which he states that Dr. Suk "fails to defend his conclusion that [Houston] should not work." (Admin. R. at 25.)

[9]A handwritten note suggests that Larson wrote to Dr. Kaufman again on December 2, 1994; there is no copy of the second letter in the administrative record.

7

surgery, but Dr. Kaufman has not answered your letter of 10-20-94. We have nothing from him. The IME by Dr. Suk indicates [Houston] has plenty of work capacity for her occ[upation] and fails to defend his conclusion that she should not do any work. What we do have is a clear statement of 7-20-93 by James W. Ryan, MD, Orthopedist, saying there were no objective findings. He diagnosed cervical strain 'which has resolved.' He felt she had functional overlay and could return to her own job w/o limitations. A report of 6-15-93 by a Dr. Mahendra A. Patel simply relates patient complaints and suggests need for "further work up, like a myelogram . . ."

I feel we should now act on the physical capacity findings of Dr. Suk and on those of other doctors (Ryan) and terminate LTD.

(Admin. R. at 25.) The report by Dr. Patel to which Dunn referred is actually the undated clinical summary submitted in March 1994. Dunn's recommendation does not mention the results of the 1993 MRI, although the summary of those results is contained in Dr. Patel's clinical summary. Nor does Dunn's recommendation mention that, concurring with Dr. Kaufman's medical opinion, Dr. Patel opined that Houston "definitely needs surgical intervention." (*Id.* at 75.)

Subsequently, in a letter dated January 6, 1995, Provident, through Larson, informed Houston that Provident had reviewed the medical information contained in Houston's file, and that "the physical capacity findings indicate you have the ability to perform not only your own occupation as legal secretary but also many other sedentary jobs." Accordingly, Provident notified Houston that, based on the Policy's definition of disability and Houston's ability to work at her previous job, Houston's disability benefits were terminated as of December 31, 1994. Provident also notified Houston of her rights under ERISA, including her right to appeal the termination of her disability benefits.

In a letter dated January 27, 1995, to update her proof of disability as previously requested, Houston submitted a second attending physician's statement of disability completed

8

by Dr. Patel together with her claimant's statement dated January 25, 1995.[10] In the attending physician's statement, Dr. Patel affirmed his previous opinion that Houston was disabled. Specifically, Dr. Patel gave his medical opinion that Houston remained disabled from her occupation and any other work, that her work capacity was "as before," and that Houston had moderate to severe impairment in range of motion.

Upon Houston's submission of the attending physician's statement and claimant's statement, Provident's ERISA appeals committee reviewed her claim file, including the recently submitted materials. In a letter dated February 13, 1995, Provident, through Larson, informed Houston that the ERISA appeals committee had upheld the termination of her benefits, explaining that the attending physician's statement from Dr. Patel was "insufficient information on which to continue disability due to your purported cervical problems." (Admin. R. at 167.) Provident further informed Houston that if she wished to submit any additional information, she must do so by March 12, 1995.

In a letter dated March 9, 1995, Houston supplemented her claim file and asked Provident to reconsider her claim for disability benefits. Houston informed Provident that, in addition to her cervical spine problems, she suffered from problems with both eyes and depression, all of which left her unable to perform her job. With her letter, Houston included medical records from Dr. Patel from August 1994 through March 1995 regarding her cervical spine injury, a diagnosis and records from an opthamologist regarding her eye problems, and a statement from a

---

[10]Provident had requested that Houston return the forms within thirty days of receiving them. According to Houston's letter, shortly after receiving the request, she notified Provident that Dr. Patel was out of the office on vacation until January 9, 1995, and that she would submit the form within thirty days of Dr. Patel's return.

psychologist regarding her depression.

In a letter dated April 6, 1995, Provident, through Larson, informed Houston that its ERISA appeals committee reviewed all of the medical information in Houston's claim file and upheld the termination of her benefits. Provident further explained that its medical and rehabilitation consultants had evaluated the reports from the opthamologist and psychologist, and Provident had concluded that neither Houston's vision problems nor her depression would prevent her from doing her job. In contrast, the letter made no reference to the medical records Houston submitted from Dr. Patel relating to her cervical spine injury. Instead, the letter simply concluded that "all the information contained in your file indicates you have the mental and physical ability to perform your job as legal secretary." (Admin. R. at 168.)

B. Procedural History

Houston commenced this litigation shortly after receiving Provident's letter of April 6, 1995. On December 21, 2000, Provident's motion for summary judgment was denied. *Houston v. Provident Life & Accident Ins. Co.*, No. 95 C 2389, 2000 WL 1898591, at *4 (N.D. Ill. Dec. 21, 2000). Subsequently, on February 21, 2002, this court granted Provident's motion to limit the trial evidence to the administrative record. *Houston v. Provident Life & Accident Ins. Co.*, No. 95 C 2389, 2002 WL 989468, at *4 (N.D. Ill. Feb. 21, 2002.) An open question remained, however, as to whether the administrative record included the MRI report dated August 2, 1993. *Id.* After reviewing the briefs the parties subsequently submitted on that limited issue, it is clear that the *results* of the 1993 MRI are part of the administrative record. Indeed, Provident emphasized (repeatedly) in its brief that the results of the 1993 MRI "were reviewed, evaluated and considered in the administrative review of Houston's claim." (*See, e.g.*, Def.'s Mem.

10

, Regarding Pl.'s MRI Report at 2.) Provident further admitted that in the clinical summary Dr. Patel submitted to Provident, Dr. Patel's description of the 1993 MRI results was virtually identical to the summary language in the actual MRI report. Thus, the court need not determine whether the actual MRI *report* dated August 2, 1993 is part of the administrative record.[11]

## II. Discussion

This court must review the administrative record and determine whether Provident's decision to terminate Houston's disability benefits was "arbitrary and capricious." Under the "arbitrary and capricious" standard, the court will reverse Provident's decision only if Provident acted unreasonably. *Quinn v. Blue Cross & Blue Shield Ass'n*, 161 F.3d 472, 475 (7th Cir. 1998) (court must look at whether decision-maker acted unreasonably, not whether it made a mistake); *Donato v. Metro. Life Ins. Co.*, 19 F.3d 375, 380 (7th Cir. 1994) (decision is arbitrary and capricious if it is "downright unreasonable"). Although the arbitrary and capricious standard is deferential, it is still "a review and not a rubber stamp." *Donato*, 19 F.3d at 380.

As the administrative record shows—and as Provident has admitted  Provident's decision to terminate Houston's benefits was based on Dr. Ryan's report, written before the MRI was taken in August 1993, and the physical capacities form submitted by Dr. Suk.[12] Provident

---

[11]Houston initially sought to admit an additional MRI report dated August 26, 1996 into evidence. However, as Provident correctly pointed out in its brief, Provident could not have considered the 1996 MRI report when making its determination about Houston's disability benefits more than a year earlier. The MRI report dated August 26, 1996, therefore, is not part of the administrative record.

[12]Examining the reasons given by the decision-maker is not the equivalent of inquiring into the decision-maker's thought processes. *See Perlman v. Swiss Bank Corp. Comprehensive Disability Prot. Plan*, 195 F.3d 975, 977 (7th Cir. 1999) (reversible error where district court went outside administrative record and permitted discovery into plan administrator's decision-making, including the thought processes and training of its staff). The ERISA statute explicitly

thus accorded more weight to those submissions than to (1) the attending physician's statements submitted in December 1993 and January 1995 by Dr. Patel, Houston's treating physician, which stated unequivocally that Houston was disabled; (2) Dr. Suk's expressly stated medical opinion that Houston was disabled, could not return to work, and required further evaluation by a neurosurgeon; and (3) Dr. Patel's clinical summary which explained the results of the 1993 MRI and expressed his agreement with the opinion of neurosurgeon Dr. Kaufman that Houston's cervical injuries required surgery to relieve her symptoms and pain.

The question, therefore, is whether Provident's decision to terminate benefits was reasonable, given the evidence presented. As a general rule, a decision to terminate benefits is not unreasonable if it was based on a *permissible* choice between the differing opinions of multiple medical experts. *Donato*, 19 F.3d at 380 (emphasis added). However, "the findings of treating physicians are entitled to some weight." *Johnson v. Ameritech Sickness & Accident Disability Benefit Plan*, No. 97 C 0990, 1999 WL 199637, at *10 (N.D. Ill. Apr. 5, 1999). In cases in which the plan administrator rejects the findings of the claimant's treating physician, as Provident did, the court must evaluate whether such rejection is rational and justifiable. *Id.* at *7.

*Donato* involved a claim for disability benefits based upon a medical theory that was "not supported by the AMA, the American College of Physicians, or any other recognized medical body." *Donato*, 19 F.3d at 380. In that case, the claimant sought disability benefits based on an environmental illness, namely, a hypersensitivity to environmental chemicals. *Id.* at 377. In

requires the decision-maker to set forth the "specific reasons" for its decision in order to allow the claimant an opportunity for "full and fair review" of the termination decision. 29 U.S.C. § 1133; *Donato*, 19 F.3d at 381. Moreover, the reasons for Provident's decision are part of the administrative record; unlike the situation in *Perlman*, they were not the product of additional discovery.

support of her claim, Ms. Donato submitted the opinions of three clinical ecologists who concluded she was disabled. But the independent medical consultants engaged by the plan administrator to review Ms. Donato's medical records disagreed with her doctors, concluding that the clinical ecologists' opinions, evaluations, tests and diagnoses did not conform to medical standards and were not widely supported in the medical field. *Id.* at 377. The district court held, and the Seventh Circuit affirmed, that the plan administrator's reliance on its independent medical consultants rather than on Ms. Donato's doctors was reasonable: it was a "permissible choice" given a claim for disability benefits "based on such a questionable medical theory." *Id.* at 380.

Provident's reliance on Dr. Ryan's report was *not* a permissible choice among differing medical opinions. In the case at bar, unlike *Donato*, Provident was not presented with a questionable medical theory. Rather, each doctor who considered the results of the 1993 MRI when rendering his medical opinion concluded that Houston could not return to work due to her cervical spine injuries. Only Dr. Ryan opined that Houston could return to work, but his medical opinion was based upon incomplete information. He issued his report on July 20, 1993; the MRI was not taken until August 3, 1993. Choosing to rely on the only medical opinion that did not take into account the results of relevant, objective medical test results constitutes an unreasonable, impermissible choice among competing medical opinions.

Provident's reliance on the physical capacity form submitted by Dr. Suk was similarly unreasonable, particularly in light of Dr. Suk's overall opinion. In the other documents Dr. Suk submitted, he explicitly stated that, in his medical opinion, Houston was disabled, required further evaluation by a neurosurgeon, and could not return to work at her job or any other job.

13

. Even on the physical capacity form, Dr. Suk did not conclude that Houston could return to work. Rather than giving a date on which Houston could return to work, he indicated that Houston could only return to light duty work "pending neurological evaluation." Provident found the physical capacity form to be inconsistent with the remainder of Dr. Suk's opinion. The administrative record shows no evidence that Provident ever successfully followed up with Dr. Suk– whom Provident engaged to conduct the IME—for clarification as to the perceived inconsistency. To the extent there were inconsistencies in Dr. Suk's report, Provident's decision to rely on parts of that report while simultaneously rejecting Dr. Suk's overall conclusion was unjustifiable. *See Johnson*, 1999 WL 199637 at *7.

Provident's decision to rely on Dr. Ryan's report, which was based upon incomplete information, and on one part of Dr. Suk's opinion, taken out of context, rather than on the opinions of Houston's treating physicians was neither reasonable nor justifiable. Indeed, the bottomline conclusion of Dr. Suk, Provident's own independent medical examiner, was that Houston was disabled. In an analogous case, *Ladd v. ITT Corp.*, 148 F.3d 753, 755-56 (7th Cir. 1998), the Seventh Circuit reversed the lower court, finding the plan administrator's decision to terminate disability benefits was arbitrary and capricious where the plaintiff's condition had worsened since she was first awarded benefits, no one who examined her believed she was able to work, and an administrative law judge for the Social Security Administration ("SSA") had found her to be disabled. Like the plaintiff in *Ladd*, the SSA deemed Houston eligible to receive social security disability payments. Additionally, there is no convincing evidence to suggest that Houston's condition had improved since she first qualified for disability benefits, nor did any examining physician who considered the results of the 1993 MRI conclude that she was able to

14

work. The court therefore concludes, after fully reviewing the administrative record, that Provident's decision to terminate Houston's disability benefits was arbitrary and capricious.

The question, therefore, is what remedy is appropriate. Depending on the facts of a given case, a court may reinstate benefits or may find it appropriate to remand the case to the plan administrator. *Quinn*, 161 F.3d at 476-77. For example, remand is the appropriate remedy in cases in which the plan administrator misconstrued the terms of the plan or failed to explain adequately the reasoning for the denial of benefits. *Id.* at 477. Additionally, remand is warranted in cases in which, although the decision to deny benefits was made in an arbitrary and capricious manner, it remains unclear whether the claimant actually qualifies for benefits. *Id.* Conversely, "[c]ases that call for reinstatement usually either involve claimants who were receiving disability benefits, and, but for their employers' arbitrary and capricious conduct, would have continued to receive the benefits, or they involve situations where there is no evidence in the record to support a termination or denial of benefits." *Id.* (collecting cases). Similarly, if no factual determinations need to be made, reinstatement, not remand, is the appropriate remedy. *See id.*

Here, Houston was receiving benefits, and but for Provident's arbitrary and capricious decision, would have continued to receive benefits. Thus, under most circumstances, reinstatement would be warranted. Given the time that has passed since Provident terminated Houston's benefits, however, the court declines to reinstate benefits on the assumption that Houston still qualifies for disability benefits. Nearly eight years have passed since the termination of her benefits and there is some suggestion in the record that surgery was contemplated at one point. Time or medical intervention may well have alleviated Houston's condition. If Houston no longer qualifies for benefits, reinstatement would give her an economic

15

, windfall. Accordingly, following the Eighth Circuit's lead in *Donaho v. FMC Corp.*, 74 F.3d 894, 901-02 (8th Cir. 1996), the court remands this case to Provident, with the following instructions: (1) Provident shall acknowledge that Houston was disabled as of December 31, 1994 (the date it terminated her benefits), (2) should Provident seek to establish that Houston's disability ended at some point, Provident shall permit additional evidence into the record to determine the duration of Houston's disability since December 31, 1994 (including but not limited to the MRI report dated August 26, 1996), and (3) Provident shall be liable to Houston for benefits for all additional time after December 31, 1994 during which Houston was disabled. Once the extent of Houston's damages for lost benefits have been determined, the parties may return to this court to brief the issue of attorney's fees, costs, and prejudgment interest.[13]

ENTER:

JOAN B. GOTTSCHALL
United States District Judge

DATED: December 9, 2002

---

[13]In her amended complaint, in addition to seeking compensation for lost benefits, attorney's fees, costs and prejudgment interest, Houston requested compensatory damages (including damages for emotional distress) and punitive damages. But under ERISA, an individual seeking to enforce her rights under a benefit plan is not entitled to recover compensatory or punitive damages. *Harsch v. Eisenberg*, 956 F.2d 651, 660-61 (7th Cir. 1992). Accordingly, the only damages Houston may recover are lost benefits, attorney's fees, costs and prejudgment interest.

16